UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

OBI IFEDIGBO,

                            Plaintiff,

        v.                                      **DECISION AND ORDER**
                                                13-CV-637S
BUFFALO PUBLIC SCHOOLS,
JOSEPH GIUSIANA, and
OLIVIA LICATA,

                            Defendants.

# I.  INTRODUCTION

In this action, Plaintiff Obi Ifedigbo alleges that his employer, Defendant Buffalo

Public Schools ("BPS"), and two BPS employees discriminated against him based on his

race and violated his due process rights, in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. §§ 1981, 1983, and 1985.

Pending before this Court is Defendants' fully briefed Motion for Summary

Judgment.  (Docket No. 23.)  For the reasons stated below, Defendants' motion is granted

in its entirety.

# II.  BACKGROUND

Ifedigbo is an African-American male of Nigerian descent.  He began working for

BPS on March 19, 1990.  (Defendants' Statement of Undisputed Facts ("Defendants'

Statement"), Docket No. 23-1, ¶ 2; Plaintiff's Local Rule 56 Statement ("Plaintiff's

Statement"), Docket No. 26-1, p. 2, ¶ 2.[1])

---

[1]This Court has confirmed and is satisfied that the evidence cited in the parties' Local Rule 56 Statements
supports the assertions therein.  Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001)
(holding that factual allegations contained in a Rule 56 Statement that find no support in the record
evidence must be disregarded and the record reviewed independently).

The organizational structure of the Buffalo public school system includes a Division of Plant Services. (Defendants' Statement, ¶ 10.) The Chief Operating Officer of BPS, who at all times relevant was Defendant Joseph Giusiana, oversees and manages the Division of Plant Services, including budgeting. (Defendants' Statement, ¶¶ 9, 10.)

Within the Division of Plant Services, there were two positions called Assistant Superintendent of Plant. (Defendants' Statement, ¶ 11; Plaintiff's Statement, p. 9, ¶ 11.) One of those positions was held by Edward Lindsay, who previously held the post of Senior Architect before his appointment to the Assistant Superintendent of Plant position on August 24, 1992. (Defendants' Statement, ¶ 3; Plaintiff's Statement, p. 8, ¶ 3.) Ifedigbo held the other position for his entire tenure with BPS. (Defendants' Statement, ¶ 2; Plaintiff's Statement, p. 8, ¶ 2.)

Although Lindsay and Ifedigbo held the same positions and were subject to the same job description, they performed different duties. Lindsay's responsibilities included the planning and design of new school buildings and the renovation of existing school buildings. (Defendants' Statement, ¶¶ 4, 12.) He negotiated construction and consulting contracts and managed and supervised the design and project-management staff. (Defendants' Statement, ¶¶ 5, 6, 12.) Ifedigbo, on the other hand, principally managed the maintenance of new and existing school buildings, including supervising clerical staff and maintenance crews, assigning work to tradesmen, and overseeing third-party service contractors. (Defendants' Statement, ¶¶ 8, 12.)

The distinctions between Lindsay and Ifedigbo's day-to-day duties are reflected in the Division of Plant Services organizational chart. (Defendants' Statement, ¶ 13.) There, Lindsay is listed as "Asst. Supt. Plant" overseeing a number of architects, the supervisor

of building construction, a mechanical engineer, and two drafting technicians, among others. (Defendants' Statement, ¶ 14.) In contrast, Ifedigbo is listed as "Asst. Supt. Bldg. Maint. & Repair" overseeing the Director of Building Repairs and more than 80 tradespeople. (Defendants' Statement, ¶ 14.)

In 2010, the BPS commissioned an organizational study by the consulting firm MGT of America, Inc. ("MGT"), to examine the use and management functions of the Buffalo public school system. (Defendants' Statement, ¶¶ 15, 17; Plaintiff's Statement, p. 9, ¶¶ 15, 17.) In its July 2, 2010 final report, MGT made the following observations and recommendations:

- that "BPS does not have a clear and effective organizational structure for the Facilities Department;"

- that "the structure and the job titles should be regularly reviewed and reflect the current needs of the District and profession;"

- that BPS should "reorganize the Facilities Department to reduce administrative staff and provide clear lines of authority and connection between units;"

- that "having three individuals in a department all with the word 'superintendent' in their title is confusing;"

- that BPS should create a "Director of New Construction" position to replace Lindsay's existing Superintendent of Plant position, which would be responsible for the "planning, implementing, and commissioning of all capital projects;" and

- that BPS create several new middle-management positions, such as "Executive Director for Facilities" and "Director of Building Safety and Health."

(Defendants' Statement, ¶¶ 16-20; Plaintiff's Statement, p. 10, ¶¶ 16-20.)

Giusiana considered the MGT Study and agreed with some of its conclusions and recommendations. (Defendants' Statement, ¶ 21.) Although he disagreed with implementing a new level of middle-management, Giusiana agreed that the Division of Plant Services would benefit from reorganization, particularly as it related to differentiating the duties actually performed by Lindsay and Ifedigbo, notwithstanding their identical job descriptions. (Defendants' Statement, ¶¶ 22-24.) Giusiana therefore began working with the BPS Department of Human Resources and the City of Buffalo Division of Civil Service in August 2010 to create a new job title that would distinguish Lindsay's planning, design, and construction duties from Ifedigbo's building-maintenance duties. (Defendants' Statement, ¶ 25.) Defendant Olivia Licata, as Administrative Director of Civil Service for the City of Buffalo Division of Civil Service, assisted Giusiana in this endeavor. (Defendants' Statement, ¶¶ 27, 28.)

Not long thereafter (in September 2010), Lindsay retired from his Assistant Superintendent of Plant position, which then remained unfilled while Giusiana and Licata explored the creation of a new job title and position. (Defendants' Statement, ¶ 26, Plaintiff's Statement, p. 10, ¶ 26.) Giusiana's department told Licata that it wanted to replace Lindsay's Assistant Superintendent of Plant position with a new title and position, while leaving Ifedigbo's position and title unchanged. (Defendants' Statement, ¶¶ 32, 50.) That is, Giusiana sought to replace only Lindsay's Assistant of Superintendent of Plant position. (Defendants' Statement, ¶¶ 32, 50.) Licata advised Giusiana that Lindsay's position could be replaced with a new job title and position without changing Ifedigbo's existing title or position. (Defendants' Statement, ¶ 34.) As a result, Giusiana created

the new position and title of "Director of Facilities, Planning, Design, and Construction" to replace Lindsay's position. (Defendants' Statement, ¶ 35; Plaintiff's Statement, ¶ 35.)

Upon Giusiana's creation of the new position, Licata deemed the new title substantially different from the Assistant Superintendent of Plant title such that creation of the "Director of Facilities, Planning, Design, and Construction" was warranted under the civil service law. (Defendants' Statement, ¶ 36.) Accordingly, on November 10, 2010, the Commissioner of Human Resources officially adopted a new civil service position titled "Director of Facilities, Planning, Design, and Construction." (Defendants' Statement, ¶¶ 37, 45; Plaintiff's Statement, ¶¶ 37, 45.) This new position incorporated into its job specifications some of the duties and qualifications from the Assistant Superintendent of Plant position, while also adding new distinguishing features to make the position more closely align with Lindsay's construction-oriented duties. (Defendants' Statement, ¶¶ 38-39.) The new position also required a NYS Professional Architect's license or the ability to obtain one within six months of appointment. (Defendants' Statement, ¶ 43.)

Ifedigbo did not apply for this new position. (Defendants' Statement, ¶ 48.) He remained in his unchanged title and position of Assistant Superintendent of Plant. Paul McDonnell, who, like Lindsay, previously worked as an architect for the City of Buffalo, received the provisional appointment to the new Director of Facilities Planning, Design, and Construction position on February 25, 2011. (Defendants' Statement, ¶¶ 49, 51.) McDonnell was fully appointed to the position on May 29, 2012, after completing the newly-developed civil service exam. (Defendants' Statement, ¶ 51.) Ifedigbo and McDonnell worked under this new restructuring without any challenge, grievance, or lawsuit since its inception through June 2012. (Defendants' Statement, ¶ 52.)

In early 2012, the Chief Financial Officer for BPS instructed all department heads to submit a proposed 10% cut in expenditures to close a projected budgetary gap of approximately $20 million. (Defendants' Statement, ¶¶ 54-55, 57.) To comply with this directive, Giusiana proposed several cuts in his department, including the elimination of Ifedigbo's Assistant Superintendent of Plant position. (Defendants' Statement, ¶ 58.) In conjunction with the results of the MGT Study, Giusiana determined that Ifedigbo's oversight duties were largely duplicative of those provided by the Director of Building Repairs, because both positions supervised the work of tradespeople and other employees involved in the maintenance and repair of district facilities. (Defendants' Statement, ¶ 59.) Giusiana therefore recommended eliminating Ifedigbo's position to the Chief Financial Officer in April 2012. (Defendants' Statement, ¶ 60.) The Chief Financial Officer accepted Giusiana's recommendation and included the elimination of Ifedigbo's position in the 2012-2013 budget proposal, which resulted in a projected savings of $68,545. (Defendants' Statement, ¶ 61.)

On May 31, 2012, Giusiana gave Ifedigbo a letter terminating his employment effective June 29, 2012. (Defendants' Statement, ¶ 65; Plaintiff's Statement, p. 19, ¶ 65.) Ifedigbo then reached out to Licata to inquire whether he had civil service rights or entitlement to any other positions within BPS. (Defendants' Statement, ¶ 66; Plaintiff's Statement, p. 19, ¶ 66.) Licata advised Ifedigbo that he had no rights under the civil service law and no entitlement to any other position with BPS.[2] (Defendants' Statement,

---

[2] Licata determined that Ifedigbo could not "bump" McDonnell out of the newly-created position because that position was not in a direct line below his title, and she further concluded that he could not "bump" the Director of Building Repairs because that position was not considered in direct line with his, and in any event, the individual who held that position had greater seniority. (Defendants' Statement, ¶¶ 68-70.)

¶ 67; Plaintiff's Statement, p. 19, ¶ 67.) Ifedigbo did not grieve Giusiana's decision to eliminate his position nor did he pursue any further relief under the civil service laws. (Defendants' Statement, ¶¶ 72-74.)

Rather, on September 6, 2012, Ifedigbo filed an Article 78 proceeding in New York State Supreme Court against BPS. (Notice of Petition, Docket No. 24-1.) Therein, Ifedigbo alleged that BPS's decision to terminate his employment was arbitrary, capricious, and an abuse of discretion. (Id.) He sought annulment of his June 29, 2012 termination and reinstatement to his same or a substantially similar position. (Id.) On April 1, 2013, the trial court granted BPS's motion for summary judgment and dismissed Ifedigbo's petition. (April 1, 2013 Order, Docket No. 24-2.)

Ifedigbo then timely appealed to the New York State Supreme Court, Appellate Division, Fourth Department. (Defendants' Statement, ¶ 86.) After full proceedings, the Fourth Department affirmed the trial court in a written opinion issued on February 6, 2015. See Ifedigbo v. Buffalo Pub. Sch., 3 N.Y.S.3d 831 (App. Div. 2015).

The Fourth Department rested its opinion on the following factual findings:

> At the time of [Lindsay's] retirement, [Ifedigbo] and [Lindsay] held the same job position, Assistant Superintendent of Plant (ASP), but the two men had different responsibilities and performed different work. [Ifedigbo] 'concentrated primarily on current plant maintenance and repair,' and [Lindsay] 'concentrated primarily on future plant planning and construction.'
>
> Rather than replace [Lindsay], [BPS] opted to eliminate the second ASP position and replace it with the new Director of Facilities position '[t]o create a better definition of responsibilities between the two positions.' According to the

---

Licata further concluded that Ifedigbo held no "retreat" rights because he never held any other permanent civil service position other than his present title. (Id. at ¶ 71.)

job specifications for the new position, the Director of Facilities had the added responsibilities of preparing estimates for construction projects as well as preparing contracts and evaluating proposals for construction or consulting services. The new position also had additional work activities, including: directing the development of office standards for design, specifications and contracts; working with outside consultants to acquire professional design, architectural and engineering services; defining the scope of work and establishing project schedules and deadlines; developing both short- and long-term capital planning and budgeting for effective utilization of school buildings and administrative facilities; and preparing and submitting budgets for capital improvements and maintenance for school facilities.  The job specifications for that position mirrored the work that was then being performed by [Lindsay].

In addition to the knowledge and skills required for the ASP, the Director of Facilities also needed to have comprehensive knowledge of budget planning and administration.  The new position required possession of a professional architecture or engineering license in contrast to the ASP position, which deemed possession of such a license to be the equivalent of the required work experience.  The promotional requirements for the Director of Facilities included '[c]ontinuous and permanent status in any city department for three years as an Associate Architect or Associate Engineer.'

Id. at 833.

In considering the case, the Fourth Department made the following findings:

- "[BPS] established as a matter of law that its actions in 2010 and in 2012 'had a rational basis and [were] not arbitrary;'"

- "[BPS] established that its decision to reorganize its Facilities Department in 2010 was made as a result of a third-party study that identified redundancy within the Department and the decision of [Lindsay] to retire;"

- "[BPS] established that the determination to eliminate [Lindsay's] ASP position and to create a new position that was more in line with the tasks and responsibilities that had been assigned to [Lindsay] was part of a rational reorganization plan;"

- "[T]hat the determination to add, as a promotional requirement, prior experience as an Associate Architect or Associate Engineer in any city department was neither arbitrary nor capricious;"

- "With respect to the elimination of [Ifedigbo's] position 20 months [after creation of the Director of Facilities position], we conclude that [BPS] established that there was an economic justification for its action;" and

- "[BPS] established that, in March 2012, all of its departments were directed to cut their budgets by ten percent."

Id. at 833-34.

In sum, the Fourth Department rejected Ifedigbo's contention that "[BPS's] sole reason for making the job specifications for the new position so narrow was 'to make it so that [Ifedigbo] wouldn't be eligible' for it while, at the same time, 'hiding this plan' to eliminate [Ifedigbo's] position in the future." Id. at 834. It found that no evidence in the record supported Ifedigbo's "conclusory and unsupported" allegations in this regard. Id.

After issuance of the Fourth Department's opinion, Ifedigbo sought reargument and leave to appeal to the New York Court of Appeals, both of which were denied. Ifedigbo v. Buffalo Pub. Sch., 6 N.Y.S.3d 525, 128 A.D.3d 1426 (App. Div. 2015); Ifedigbo v. Buffalo Pub. Sch., 38 N.E.3d 827 (N.Y. 2015).

While his Article 78 proceeding was pending, Ifedigbo commenced the instant action on June 17, 2013. (Docket No. 1.) He filed an amended complaint on September 5, 2013, which alleges five causes of action: (1) unlawful discrimination on the basis of race, in violation of Title VII; (2) unlawful discrimination on the basis of race, in violation of 42 U.S.C. § 1981; (3) violation of due process, in violation of 42 U.S.C. § 1983; (4) violation of equal protection, in violation of 42 U.S.C. § 1983; and (5) conspiracy to violate

civil rights, in violation of 42 U.S.C. § 1985. (Amended Complaint, Docket No. 5, ¶¶ 33-70).

Defendants moved for summary judgment on March 31, 2015. (Docket No. 23.) After completion of briefing on May 18, 2015, this Court reserved decision without oral argument.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has instructed district courts to use extra care when deciding whether to grant summary judgment, because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). But that does not preclude summary judgment in employment discrimination actions: "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." Id.

**B. Defendants' Motion for Summary Judgment**

Defendants argue that they are entitled to summary judgment principally because (1) Ifedigbo's claims are barred by the preclusion doctrines (collateral estoppel and res judicata), and (2) Ifedigbo fails to raise material issues of fact and Defendants are entitled to judgment as a matter of law on each of his claims.[3]  These arguments are discussed below.

**1. The Preclusion Doctrines**

"The Full Faith and Credit Act, 28 U.S.C. § 1738, . . . requires the federal court to give the same preclusive effect to a state-court judgment as another court of that State would give." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 293, 125 S. Ct. 1517, 1527, 161 L. Ed. 2d 454 (2005) (internal quotation omitted); see West v. Ruff, 961 F.2d 1064, 1065 (2d Cir. 1992).  Application of the preclusion doctrines—collateral estoppel and res judicata—serves to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 415, 66 L. Ed. 2d 308 (1980).

"To determine the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state." Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 87 (2d Cir. 2000); see Giannone v. York Tape & Label, Inc., 548 F.3d 191, 192-93 (2d Cir. 2008) ("[W]hen determining the effect of a state

---

[3] Defendants also argue that the individual defendants are entitled to qualified immunity on Ifedigbo's constitutional claims.  Because this Court finds Defendants otherwise entitled to summary judgment, it need not reach this argument.

court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state.")

Because Defendants argue that the New York Article 78 proceeding has preclusive effect, this Court looks to New York law.

### a.    Collateral Estoppel

In New York, collateral estoppel, or issue preclusion, bars the relitigation "in a subsequent action or proceeding [of] an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." Ryan v. New York Tel. Co., 467 N.E.2d 487, 490 (N.Y. 1984) (quoted in Burgos v. Hopkins, 14 F.2d 787, 792 (2d Cir. 1994)); see Marvel Characters, Inc. v. Simon, 310 F.3d 280, 288 (2d Cir. 2002) (noting that collateral estoppel "prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding"); United States v. Alcan Aluminum Corp., 990 F.2d 711, 718-19 (2d Cir. 1993) (the "fundamental notion [of collateral estoppel] is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies").    That is, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153, 99 S. Ct. 970, 973, 59 L. Ed. 2d 210 (1979).

The doctrine applies in New York if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is

asserted had a full and fair opportunity to litigate the issue in the first proceeding." Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir. 1995); Schwartz v. Public Adm'r, 246 N.E.2d 725, 729 (N.Y. 1969). To satisfy the first requirement, the proponent must show that "[t]he issue to be decided in the second action is material to the first action or proceeding and essential to the decision rendered therein, and that it is the point actually to be determined in the second action or proceeding such that 'a different judgment in the second would destroy or impair rights or interests established by the first.'" D'Andrea v. Hulton, 81 F. Supp. 2d 440, 443 (W.D.N.Y. 1999) (quoting Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp., 165 N.E. 456, 457 (N.Y. 1929)). The party seeking to apply collateral estoppel carries the burden on the first requirement; the party seeking to avoid it carries the burden on the second. See Khandhar v. Elfenbein, 943 F.2d 244, 247 (2d Cir. 1991); Hames v. Morton Salt, Inc., No. 12-CV-394, 2015 WL 12552030, at *3 (W.D.N.Y. Apr. 10, 2015).

Defendants argue that collateral estoppel works to bar Ifedigbo's claims altogether, because the issues raised in this action are the same as those resolved in the Article 78 proceeding, and because Ifedigbo had a full and fair opportunity to litigate those issues. Such is not the case. While Ifedigbo had a full and fair opportunity to litigate in the Article 78 proceeding, the only issues resolved there that are also raised here concern whether Defendants had a legitimate reason for terminating Ifedigbo's employment and whether Defendants were required to place Ifedigbo in the newly-created position. On the first issue, the state court found that "[w]ith respect to the elimination of [Ifedigbo's] position 20 months [after creation of the Director of Facilities position], we conclude that [BPS] established that there was an economic justification for its action." Ifedigbo, 3 N.Y.S.3d

at 833-34.  On the second issue, the state court found that BPS acted rationally in determining that Ifedigbo was not entitled to fill the newly-created position.  <u>See id.</u> at 833.

Contrary to Defendants' argument, the first finding does not entirely foreclose Ifedigbo's discrimination claims, because it is a "faulty assumption that termination for cause *necessarily* precludes the possibility of termination motivated by unlawful animus."[4] <u>Leon v. New York City Dep't of Educ.</u>, No. 14-1811, 612 Fed.Appx. 632, 635 (2d Cir. May 22, 2015) (emphasis in original).  In other words, it is possible for a plaintiff to succeed on a discrimination claim even if there is also a legitimate reason for an employer's action. <u>See, e.g.</u>, <u>Matusick v. Erie Cty. Water Auth.</u>, 757 F.3d 31, 47 (2d Cir. 2014) (finding that a hearing officer's findings that a plaintiff had engaged in violations that justified termination did not preclude a jury from later finding that the plaintiff's termination was based at least in part on discrimination).  Here, for example, Ifedigbo proceeds under both pretext and mixed-motive theories of discrimination.

But Ifedigbo did not raise his race-discrimination claims in the Article 78 proceeding, nor did the state court make any findings concerning what role, if any, race played in Defendants' decision to eliminate Ifedigbo's position.  Rather, Ifedigbo's Article 78 petition alleged that Defendants acted "in an arbitrary and capricious manner" and with no justifiable reason when it eliminated his position.  <u>See</u> Notice of Petition, Docket No. 24-1.  The state court therefore never made any findings concerning discrimination.[5]

---

[4] As discussed below, however, the second finding precludes Ifedigbo's § 1983 due process claim.

[5] For this reason, Defendants' reliance on <u>Rameau v. New York State Dep't of Health</u> and <u>Smith v. New York City Dep't of Educ.</u>, is misplaced. 741 F. Supp. 68, 71 (S.D.N.Y. 1990); 808 F. Supp. 2d 569 (S.D.N.Y. 2011).  <u>Smith</u> involved Article 75 teacher-tenure rules and procedures, and the court there found that "the hearing officers actually decided that any adverse employment action was justified and not based on impermissible discrimination."  808 F. Supp. 2d at 580.  And in <u>Rameau</u>, which involved an Article 78

Consequently, not all of the issues raised in this action are the same as those presented in the Article 78 proceeding, thus barring the wholesale application of collateral estoppel that Defendants advocate.  See Goonewardena v. New York State Workers' Comp. Bd., 09 Civ. 8244 (RA)(HBP), 2016 WL 7439414, at *8 (S.D.N.Y. Feb. 9, 2016) (rejecting application of collateral estoppel where Article 78 petition did not allege race discrimination); Lawtone-Bowles v. City of New York, Dep't of Sanitation, 22 F. Supp. 3d 341, 349 n.8 (S.D.N.Y. 2014) (same); Latino Officers Ass'n v. City of New York, 253 F. Supp. 2d 771, 786-88 (S.D.N.Y. 2003) (same); Harp v. City of New York, 218 F. Supp. 2d 495, 500 (S.D.N.Y. 2002) (denying application of collateral estoppel to race-discrimination claims where the plaintiff's Article 78 petition did not raise any claims of racial discrimination).

### b.    Res Judicata

Res judicata, or claim preclusion, is a similar preclusion doctrine.  It holds that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  Allen, 449 U.S. at 94.  The doctrine "is based on the requirement that the plaintiff must bring all claims at once against the same defendant relating to the same transaction or event."  N. Assur. Co. of Am. v. Square D Co., 201 F.3d 84, 88 (2d Cir. 2000) (citation omitted).

New York law employs a transactional analysis for res judicata.  This analysis "bar[s] a later claim arising out of the same factual grouping as an earlier litigated claim

proceeding, the plaintiff claimed that his dismissal was arbitrary and capricious *because* it was based on racial discrimination.  In contrast to both of these cases, Ifedigbo's Article 78 proceedings did not concern any possible discriminatory reasons for his termination.

even if the later claim is based on different legal theories or seeks dissimilar or additional relief." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Employment of this approach "'does not . . . permit a party to remain silent in the first action and then bring a second one on the basis of a preexisting claim for relief that would impair the rights or interests established in the first action.'" Beckford v. Citibank N.A., 00 Civ. 205, 2000 WL 1585684, at *3-*4 (S.D.N.Y. Oct. 24, 2000) (quoting Henry Modell & Co. v. Minister, Elders & Deacons of Reformed Protestant Dutch Church, 502 N.E.2d 978 n.2 (1986)).

Res judicata applies in New York to bar a subsequent claim when "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Pike v. Freeman, 266 F.3d 78, 91 (2d Cir. 2001); see Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000). To determine whether claims were or could have been asserted in the first action, courts consider whether the second suit concerns "the same claim—or nucleus of operative facts—as the first suit" by assessing "(1) whether the underlying facts are related in time, space, origin, or motivation; (2) whether the underlying facts form a convenient trial unit; and (3) whether their treatment as a unit conforms to the parties' expectations." Channer v. Dep't of Homeland Sec., 527 F.3d 275, 280 (2d Cir. 2008) (internal quotation marks omitted). Res judicata does not apply, however, where "the initial forum did not have the power to award the full measure of relief sought in the later litigation." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

Defendants argue that res judicata bars Ifedigbo's race-discrimination claims, because the Article 78 proceeding was an adjudication on the merits, Ifedigbo was a party

to the proceeding, and Ifedigbo could have asserted his race-discrimination claims. Notwithstanding whether each prong of res judicata is met, the doctrine does not apply, because Ifedigbo could not obtain the full measure of relief in the Article 78 proceeding that is available to him here.  See <u>Colon</u>, 58 F.3d at 870 n.3.

In the Article 78 proceeding, Ifedigbo sought only reinstatement or promotion. (Notice of Petition, Docket No. 24-1.)  Here, however, Ifedigbo seeks compensatory and punitive damages, which are not available in Article 78 proceedings.  See <u>Goonewardena</u>, 2016 WL 7439414, at *9.  Consequently, because the state court lacked the power to award Ifedigbo the full measure of damages that he now seeks, res judicata does not bar his claims.  See <u>id.</u> (finding that Article 78 proceeding had no res judicata effect because the state court did not have the power to award the full measure of damages sought in the second action); <u>see also</u> <u>Colon</u>, 58 F.3d at 870 n.3 (similar); <u>Davis v. Halpern</u>, 813 F.2d 37, 39 (2d Cir. 1987) ("[A] New York plaintiff is not barred from seeking damages, in federal court, on civil rights claims by reason of a prior judgment on the same underlying facts in an Article 78 proceeding requesting injunctive or affirmative relief."); <u>Harp</u>, 218 F. Supp. 2d at 499 ("Res judicata does not apply to the plaintiff's racial discrimination claim because in this action, he seeks compensatory damages that were not available in the Article 78 proceedings.")

## 2.    Ifedigbo's Claims

### a.    Title VII Race-Discrimination Claim

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1);

Desert Palace, Inc. v. Costa, 539 U.S. 90, 92-93, 123 S. Ct. 2148, 2150, 156 L. Ed. 2d 84 (2003). When, such as here, there is no direct evidence of discrimination, the McDonnell Douglas burden-shifting analysis applies. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000).

Under this framework, the plaintiff must first establish a prima facie case of race discrimination by showing that (1) he was a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances of that adverse employment action give rise to an inference of discrimination. See Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

If the plaintiff meets this initial burden, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981)). If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Weinstock, 224 F.3d at 42 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993)).

If the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's explanation is pretext for unlawful discrimination. Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (per curiam). The plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a

mere pretext for actual discrimination." Weinstock, 224 F.3d at 42. The plaintiff "must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004); see Terry, 336 F.3d at 138. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Id. But "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." Weinstock, 224 F.3d at 42 (quoting St. Mary's, 509 U.S. at 519).

There is no serious dispute that Ifedigbo has met his minimal burden of setting forth a prima facie case of race discrimination. "The burden of establishing a *prima facie* case of disparate treatment is not onerous." See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing burden as "minimal"). Ifedigbo is an African-American male; he was performing his job duties satisfactorily; his employment was terminated; and the circumstances of his termination, particularly the timing, arguably give rise to an inference of discrimination.

Alternatively, given the minimal burden at this stage and Defendants' proffer of a legitimate, non-discriminatory reason for terminating Ifedigbo's employment (discussed below), this Court finds it most expeditious to assume the existence of a prima facie case and move to the next stage of the analysis. See Besht v. Gen. Motors, 327 F. Supp. 2d 208, 212-13 (W.D.N.Y. 2004) (citing United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly

made out a prima facie case, whether the plaintiff really did so is no longer relevant.")); Wado v. Xerox Corp., 991 F. Supp. 174, 187 (W.D.N.Y. 1998).

The burden now rests with Defendants to produce a legitimate, non-discriminatory reason for Ifedigbo's termination. See Reeves, 530 U.S. at 142 (noting that the defendant's burden at the second stage is not one of proof or persuasion, but is more appropriately considered a burden of production.) "This explanation must be 'clear and specific.'" Gallo, 22 F.3d at 1226 (quoting Meiri, 759 F.2d at 997).

Here, this Court need not linger. The issue of whether Defendants established a legitimate, non-discriminatory reason for Ifedigbo's termination was settled in the Article 78 proceeding, and, as indicated above, those determinations are entitled to preclusive effect. In particular, Defendants have established (1) that Ifedigbo's termination had a rational basis and was not arbitrary; (2) that Ifedigbo's termination was based on the results of the MGT Study and BPS's decision to reorganize Ifedigbo's department; (3) that all BPS departments were directed to cut their budgets by 10%; and (4) that there was economic justification for Ifedigbo's termination. See Ifedigbo, 3 N.Y.S.3d at 833-34. Thus, Defendants have met their burden under the McDonnell Douglas test.

Ifedigbo must now present sufficient evidence from which a factfinder could conclude that Defendants' legitimate, non-discriminatory reasons are false and mere pretext for unlawful race discrimination. "Where a plaintiff has alleged that an employer's reasons for an adverse employment action are pretextural, all reasonable inferences must be drawn in favor of the plaintiff's showing of pretext." Joseph v. Manhattan & Bronx Surface Transit Operating Auth., No. 96 Civ. 9015, 2004 WL 1907750, at *14 (S.D.N.Y. Aug. 25, 2004). At this stage, the court must "examin[e] the entire record to determine

whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143.) This requires the court to determine whether "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson v. New York State Dep't of Corr. Servs., 180 F.3d 426, 443 (2d Cir. 1999). A defendant's proffered non-discriminatory reason, however, "cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Olle v. Columbia Univ., 332 F.Supp.2d 599, 617 (S.D.N.Y. 2004) (quoting St Mary's, 509 U.S. at 502); see also AB v. Rhinebeck Cent. Sch. Dist., 224 F.R.D. 144, 153 n.9 (S.D.N.Y. 2004).

Consequently, to avoid summary judgment, Ifedigbo must establish the existence of a genuine issue of fact as to whether Defendants' proffered explanations are false and merely pretext for unlawful discrimination. Weinstock, 224 F.3d at 42. Unless Ifedigbo can point to evidence that reasonably supports a finding of prohibited discrimination, Defendants are entitled to summary judgment. See James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000); see also Reeves, 530 U.S. 133 at 148 (noting that a defendant is entitled to summary judgment if "the plaintiff create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination ha[s] occurred").

Ifedigbo fails to carry his burden at this stage.

First, the state court has already determined that Defendants had a legitimate and justifiable economic reason for terminating Ifedigbo's employment. See Ifedigbo, 3

N.Y.S.3d at 833-34.  Ifedigbo is therefore precluded from again attempting to prove that those reasons were false and that no legitimate reasons for his termination existed.  For that reason, his assertions that Giusiana and Licata acted outside the civil service law (e.g., failed to abolish his position in good faith, failed to honor bumping rights) and cited department restructuring only as a ruse for racial discrimination are nonstarters.  So too are Ifedigbo's overarching arguments—curiously termed "the false epiphany" and "new coat of paint"—that there was no difference between his position and Lindsay's, and no difference between his position and the newly-created position filled by McDonnell. (Plaintiff's Statement, pp. 3-5.)  The state court rejected both arguments.  See Ifedigbo, 3 N.Y.S.3d at 833-34.

All that remains, then, are Ifedigbo's wholly inadequate arguments that Defendants are simply lying and that their actions are consistent with a "history of racial discrimination against African Americans" by the BPS.  Here again, the state court necessarily found that Defendants are not lying, because it found that BPS established a justifiable basis for Ifedigbo's termination.  And in any event, such unsubstantiated and non-evidentiary arguments are wholly insufficient to avoid summary judgment, as they do not constitute admissible evidence from which a factfinder could conclude that Defendants' legitimate, non-discriminatory reasons for Ifedigbo's termination are false.  See Matsushita, 475 U.S. at 586 (noting that the nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful").

Second, and similarly, Ifedigbo presents no evidence from which a reasonable finder of fact could conclude that his employment was terminated because of his race.

The only fact even hinting at possible discrimination involves the timing of Ifedigbo's termination, which occurred just two days after McDonnell was fully appointed to the new position. (Defendants' Statement, ¶ 51.) Evidence in the record, however, indicates that this timing was the function of the mandated budget cuts, the creation of the new civil service title and test, and the process of approving Giusiana's recommendation to the Chief Financial Officer, rather than any discriminatory motive. (Defendants' Statement, ¶¶ 60, 61.) Indeed, Ifedigbo and McDonnell worked together for nearly 18 months before Ifedigbo's position was eliminated. (Defendants' Statement, ¶ 52.) Thus, this single fact alone does not reasonably support Title VII liability.

As for a mixed-motive theory of discrimination, which Ifedigbo suggests in his papers, this too fails. In a mixed-motive case, the plaintiff's initial burden is to "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." Tyler v. Bethlehem Steel Corp., 958 F. 2d 1176, 1181 (2d Cir. 1992) (quoting Price Waterhouse, 490 U.S. at 258). This is a heavier burden than the *de minimis* one a plaintiff bears under a pretext theory, because the plaintiff must "show that the evidence is sufficient to allow a factfinder to infer both permissible and discriminatory motives." Raskin v. Wyatt Co., 125 F.3d 55, 61 (2d Cir. 1997). The burden is then on the defendant to prove by a preponderance of the evidence its affirmative defense "that it would have reached the same decision as to [the employee's employment] even in the absence of the" discrimination. Id. (citations omitted).

To succeed on a mixed-motive theory, indeed, to even shift the burden to the defendant, the plaintiff must produce direct evidence of discrimination akin to "a 'smoking

gun' or at least a 'thick cloud of smoke.'" <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 61 (2d Cir. 1997) (quoting <u>Fields v. New York State Office of Mental Retardation & Developmental Disabilities</u>, 115 F.3d 116, 124 (2d Cir. 1997)). Such evidence might include "policy documents and evidence of statements or actions by decisionmakers 'that may be viewed as *directly reflecting* the alleged discriminatory attitude.'" <u>Raskin</u>, 125 F.3d at 60-61 (emphasis in original) (quoting <u>Lightfoot v. Union Carbide Corp.</u>, 110 F.3d 898, 913 (2d Cir. 1997)).

Ifedigbo presents no such evidence here. There is no evidence directly reflecting that Defendants eliminated Ifedigbo's position, even in part, because of his race. There is no smoking gun. Ifedigbo's mixed-motive theory therefore also fails.

Accordingly, even viewing the evidence and drawing all inferences in Ifedigbo's favor, this Court finds insufficient evidence from which a trier of fact could reasonably conclude that Defendants terminated Ifedigbo's employment, in whole or in part, due to his race. Defendants are therefore entitled to summary judgment on Ifedigbo's Title VII claims.[6]

### b. § 1981 Race-Discrimination Claim

Forty-two U.S.C. § 1981(a) provides as follows:

---

[6] Ifedigbo's Title VII claims must also be independently dismissed against Giusiana and Licata, because it is well-settled that individuals may not be held liable under Title VII. <u>See</u> <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1313-16 (2d Cir. 1995), <u>abrogated on other grounds by</u>, <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

A § 1981 race-discrimination claim consists of the following elements: (1) membership in a racial minority; (2) an intention to discriminate on the basis of race by the defendants; and (3) discrimination concerning one or more of the activities enumerated in the statute. See Brown v. City of Oneonta, N.Y., 221 F.3d 329, 339 (2d Cir. 2000); Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1995) (per curiam). And it is subject to the same McDonnell-Douglas burden-shifting analysis applicable to a Title VII claim. See Vill. of Freeport v. Barrella, 814 F.3d 594, 607 (2d Cir. 2016) ("[W]e analyze claims of racial discrimination identically under Title VII and § 1981 . . . ."); Tolbert v. Smith, 790 F. 3d 427, 434 (2d Cir. 2015) ("The Title VII, § 1981 . . . discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in [McDonnell Douglas]"). Consequently, for the reasons just discussed in the context of Ifedigbo's Title VII claims—lack of sufficient proof of race-based discrimination—Defendants are entitled to summary judgment on Ifedigbo's § 1981 claim.

### c. § 1983 Due Process and Equal Protection Claims

Forty-two U.S.C. § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695 n.3, 61 L. Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought under § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Ifedigbo's due process and equal protection claims fall under the Fourteenth Amendment.

### (i)    Due Process Claim

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S.

Const. amend. XIV, § 1.  Property interests are created and defined by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972).  "When a governmental employee is found to have a 'property interest' in continuation of his or her employment, the Due Process Clause of the Fourteenth Amendment forbids discharge unless the employee is afforded a pre-termination hearing."  O'Neill v. City of Auburn, 23 F.3d 685, 688 (2d Cir. 1994).

As applicable here, under New York law, "a person holding a position by permanent appointment in the competitive class of the classified civil service may not be removed . . . except for incompetency or misconduct."  Cifarelli v. Vill. of Babylon, 894 F. Supp. 614, 619 (E.D.N.Y. 1995) (internal citations and quotations omitted) (quoting N.Y. Civ. Serv. L. § 75).  The Second Circuit has held that employment under the New York civil service law is protected under the Fourteenth Amendment.  See O'Neill, 23 F.3d at 688-89; Dwyer v. Regan, 777 F.2d 825, 831-32 (1985).  Such employment therefore cannot be terminated without the protections afforded by due process.

Here, Ifedigbo's position was abolished; he was not removed.  As the Fourth Department noted:

> It is well established that a public employer may abolish civil service positions for the purposes of economy or efficiency . . ., but it may not act in bad faith in doing so . . ., nor may it abolish positions as a subterfuge to avoid the statutory protection afforded civil servants before they are discharged . . . A petitioner challenging the abolition of his or her position

must establish that the employer in question acted in bad faith."

Ifedigbo, 3 N.Y.S.3d at 834 (quotations and citations omitted).

In any event, Ifedigbo's claim is simply a repackaged version of the claim that he asserted in the Article 78 proceeding. He maintains that Defendants violated his due process rights by not adhering to § 80 of the New York Civil Service Law,[7] under which Ifedigbo believes he should have been permitted to "bump" McDonnell and take the Director of Facilities Planning, Design, and Construction position after Giusiana abolished his position.[8] (Plaintiff's Statement, p. 6, ¶ 6.) Notwithstanding that § 80 appears not to apply because Ifedigbo's civil service title was different from the newly-created title, see, e.g., Matter of McDermott v. New York State Off. of Mental Health, 613 N.Y.S.2d 57, 57, (App. Div. 1994) (finding that "same or similar positions" in § 80 means positions in the same title), the state court already resolved this issue.

In the Article 78 proceeding, Ifedigbo alleged "that [BPS] acted arbitrarily in creating the new position of Director of Facilities Planning, Design, and Construction in 2010, *in failing immediately to place [Ifedigbo] in that position*, and in eliminating his position in 2012." Ifedigbo, 3 N.Y.S.3d at 832 (emphasis added). He specifically asserted in his petition that he should have been "bumped" to the position of Director of Facilities, Planning, Design, and Construction because he is the true incumbent for that position;

---

[7] Section 80 governs "suspension or demotion upon the abolition or reduction of positions." See N.Y. Civ. Serv. L. § 80.

[8] As noted, Ifedigbo did not grieve or otherwise pursue administrative relief related to the elimination of his position or the denial of his "bumping" rights. (Defendants' Statement, ¶¶ 72-74.)

that BPS should have moved him into the new position; and that "BPS misled [Ifedigbo] and acted in contradiction to what Civil Service Law requires by not bouncing the employee in what was [Ifedigbo's] old position." (Notice of Petition, ¶¶ 16, 22, 30.)

The state court rejected these claims, finding that BPS "established that the determination to eliminate [Lindsay's] ASP position and to create a new position that was more in line with the tasks and responsibilities that had been assigned to [Lindsay] was part of a rational reorganization plan." Ifedigbo, 3 N.Y.S.3d at 833. The state court further found no fault in BPS's determination of the new job's specifications or qualifications, finding that "[Ifedigbo] submitted nothing in opposition to the motion to establish that either the determination to create the new position or the determination concerning the job specifications for that new position was "without foundation in fact . . . [or] without sound basis in reason." Id. (citing Matter of Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1 of Town of Scarsdale & Mamaroneck, Westchester Cty., 313 N.E.2d 321, 325 (N.Y. 1974)). Thus, the state court resolved the issue of whether Ifedigbo was entitled to be placed in the new position. He was not. Ifedigbo is precluded from now re-litigating that issue. See Montana, 440 U.S. at 153 ("[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."). Consequently, Defendants are entitled to summary judgment on this claim.

## (ii)     Equal Protection Claim

"The Fourteenth Amendment provides public employees with the right to be 'free from discrimination.'" Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015) (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)).  Public employees aggrieved by discrimination in the terms of their employment can therefore sue responsible state actors under § 1983.  See id.  Once action under color of state law is established, a plaintiff's Fourteenth Amendment equal protection claim mirrors a Title VII claim:  "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together."[9]  Feingold, 366 F.3d at 159 (citing Annis v. Cty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998) ("In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims.")).  Consequently, for the same reasons Defendants are entitled to summary judgment on Ifedigbo's Title VII claim, they are entitled to summary judgment on his § 1983 equal protection claim, as there is no dispute that Defendants are state actors.

Defendants Licata and BPS are additionally entitled to summary judgment on this claim due to lack of personal involvement in the alleged constitutional deprivation.  Personal involvement in the deprivation of federal constitutional rights is the *sine qua non* of liability under § 1983.  See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999).  Moreover, it is well settled in this circuit that personal involvement by

---

[9] Unlike a Title VII claim, however, a § 1983 claim can be brought against an individual.  See Vega, 801 F.3d at 88.

defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.  See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).  The Second Circuit construes personal involvement to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

Here, Ifedigbo has failed to present sufficient evidence from which a factfinder could conclude that Licata was personally involved in the decision to terminate his employment.  Rather, it is undisputed that it was Giusiana who decided that Ifedigbo's position should be eliminated.  (Defendants' Statement, ¶ 58.)  Licata, in fact, was not even a BPS employee.  (Id. at ¶ 28.)  She was the Administrative Director of Civil Service in the Department of Human Resources, Division of Civil Service, for the City of Buffalo. (Id.)  Licata is therefore additionally entitled to summary judgment on this claim for lack of personal involvement.

BPS is also entitled to summary judgment on this claim.  Section 1983 imposes liability on a municipality when its official custom or policy *causes* an employee to violate an individual's constitutional rights.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).  Like supervisory liability, municipal liability in

the context of § 1983 actions cannot be premised solely on a *respondeat superior* theory, but must be based on constitutional deprivations caused by an officially promulgated, or *de facto*, governmental "custom" or "policy[.]"  Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S. Ct. 1292, 1298, 89 L. Ed. 2d 452 (1986).

The existence of municipal policy or custom can be demonstrated in several ways, including: (1) showing an officially promulgated and endorsed municipal policy, Monell, 436 U.S. at 658; (2) showing that actions taken by officials with final policymaking authority caused a constitutional violation, Pembaur, 475 U.S. at 480–81; (3) showing that municipal decisionmaking evidences "deliberate indifference" to the rights of those with whom municipal employees come in contact, including failure to remedy an otherwise constitutional policy so deficient that policymakers knew or should have known with a high degree of certainty that constitutional violations could result, City of Oklahoma City v. Tuttle,  471 U.S. 808, 819, 105 S. Ct. 2427, 2434, 85 L. Ed. 2d 791 (1985), or failure to train employees when training is necessary to prevent the violation of federal rights, City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989).

Here, Ifedigbo neither alleges the existence of a municipal policy or custom nor offers any proof of one in opposition to Defendants' motion.  In fact, Ifedigbo does not address this aspect of Defendants' motion, other than to state that his § 1983 equal protection claim is "functionally the same" as his Title VII claim.  Accordingly, this Court finds that BPS is further entitled to summary judgment on this claim for insufficient proof of a municipal policy or custom that caused the alleged constitutional deprivations.

### d. § 1985 (3) Conspiracy Claim

Forty-two U.S.C. § 1985 (3) provides as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

To succeed on a § 1985 claim, a plaintiff must prove "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." United Bhd. of Carpenters & Joiners, Local 610 v. Scott, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 3356, 77 L. Ed. 2d 1049 (1983). The plaintiff must also establish "some racial, or perhaps

otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798, 29 L. Ed. 2d 338 (1971); see also Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999).  Importantly, in the absence of a valid § 1983 claim, there can be no § 1985 claim.  See O'Bradovich v. Vill. of Tuckahoe, 325 F. Supp. 2d 413, 426 (S.D.N.Y. 2004) ("In the absence of any claim establishing a violation of civil rights, the court must also dismiss claims of conspiracy brought under § 1985.").

Here, this Court has already determined that Defendants are entitled to summary judgment on Ifedigbo's § 1983 claims.  In addition, Ifedigbo is independently unable to meet his burden on his § 1985 (3) claim.  In the absence of sufficient evidence from which a reasonable factfinder could conclude that Defendants discriminated against Ifedigbo on the basis of his race, which is the case here, Ifedigbo cannot prove the existence of a conspiracy to deprive him of his civil rights on account of his race.  Defendants are therefore necessarily entitled to summary judgment on this claim.

## IV. CONCLUSION

Ifedigbo has failed to come forth with sufficient evidence from which a finder of fact could conclude that he was the victim of racial discrimination in employment or that Defendants violated his due process rights.  As a result, having viewed all evidence and drawn all inferences in Ifedigbo's favor, this Court finds that Defendants are entitled to summary judgment on each of Ifedigbo's claims.  Defendants' Motion for Summary Judgment is therefore granted.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 23) is GRANTED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.


Dated:  March 10, 2018
          Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge
